

FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA 12 APR -6  P1 12: 18
## TAMPA DIVISION

UNITED STATES OF AMERICA,
and THE STATE OF FLORIDA

BRENDA FARNSWORTH

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA,

          **Plaintiffs,**

vs.

HOSPITAL CORPORATION OF
AMERICA (HCA), a Delaware corporation,
GALENCARE, INC. d/b/a NORTHSIDE
HOSPITAL, a Florida corporation and
PARALLON BUSINESS SOLUTIONS, LLC,
a Tennessee corporation,

          **Defendants.**

_____/

CASE NO.: 8:12-CV-734-T-27TGW

## TO BE FILED
## *IN CAMERA* AND UNDER SEAL

## COMPLAINT

The United States of America, by and through *qui tam* relator Brenda Farnsworth

**("Relator," "Relator Farnsworth" or "Farnsworth")**, brings this action under the False

Claims Act, 31 U.S.C. §§ 3729-3732, to recover all damages, penalties and other remedies

established by the False Claims Act on behalf of the United States of America and the State of

Florida.

      1.     This is an action to recover damages and civil penalties on behalf of the United

States of America, for violations of the False Claims Act arising from false or fraudulent records,

statements, or claims, or any combination thereof, made, used or caused to be made, used or

presented by the Defendants, their agents, employees, or co-conspirators, or any combination





thereof, with respect to false claims made to the United States Department of Health and Human Services under the federal Medicare and Medicaid Program.

## Jurisdiction and Venue

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C. §§ 1329-3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and § 3730.

3.      Venue is proper in the United States District Court for the Middle District of Florida pursuant to 31 U.S.C. 3732(a) because each defendant transacts business within the district, and the acts proscribed by the False Claims Act occurred within the district.

4.      Relator did not derive the allegations of wrongdoing specified below from public disclosures.  Instead, Relator Farnsworth is the "original source" of the information [as defined in 31 U.S.C. § 3730(e)(4)] on which the allegations contained herein are based.

5.      Farnsworth served a copy of this complaint upon the United States Government, together with a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

6.      Relator Farnsworth has complied with all other conditions precedent to bringing this action.

## The Parties

7.      Relator Farnsworth is a citizen of the United States and resides in St. Petersburg, Florida.

8.      Defendant HCA Holdings, Inc., (**"HCA"**) is a Delaware corporation with its principal place of business in Nashville, Tennessee.

9.      Defendant Galencare Inc. d/b/a Northside Hospital (**"Northside Hospital"**) is a Florida corporation with its principal place of business in Pinellas County, Florida.

2

**10.**     Defendant Parallon Business Solutions, LLC (**"Parallon"**) is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

<u>**Factual Allegations**</u>

**11.**     HCA is the parent corporation of Northside Hospital and directs all policies and procedures followed by the staff at Northside Hospital.

**12.**     Northside Hospital is a 288-bed teaching hospital, accredited by the American Osteopathic Association for its Internship, Residency and Fellowship programs.

**13.**     Parallon Business Solutions, LLC is a subsidiary of HCA and provides medical records personnel to Northside Hospital. Parallon is also responsible for billing the Center for Medicare and Medicaid Services (**"CMS"**) for medical services rendered at Northside Hospital.

**14.**     The Medicare and Medicaid Program is a system of health insurance administered by the United States Department of Health and Human Services through CMS. The Program is a 100% federally subsidized health insurance system for the poor, disabled persons, or persons who are 65 or older.

**15.**     Approximately 50% of the patients at Northside Hospital use Medicaid or Medicare benefits to pay for their medical services.

**16.**     Medicare Part A provides coverage for inpatient hospital care. Medicare Part B provides supplemental coverage for physician services. A Medicare beneficiary who is admitted to a hospital by a private physician routinely receives services under both Parts A and B.

**17.**     Medicare Part A payments are made on a prospective basis. Hospitals are paid a pre-determined amount on each Medicare case. The amount is largely determined by the diagnosis-related group into which the case falls. 42 U.S.C. § 1395 ww(d)(3). Therefore, the fewer actual costs the hospital incurs per patient case, the greater its profit or lesser its loss.

3

**18.** On August 1, 2011, Relator Farnsworth began her employment with Northside Hospital as Vice President of Quality and Risk Management, however she is currently on forced administrative leave.

**19.** While working at Northside Hospital, Farnsworth repeatedly voiced concerns regarding various activities and techniques of the medical staff that were endangering patients' health and welfare. Farnsworth expressed these concerns to the Chief Executive Officer, Steven Daugherty, and the Chief Nursing Officer, Pam Carroll, during staff meetings, executive board meetings, peer committee reviews, and separate conferences.

**20.** These practices were causing a continuing detrimental effect upon the quality of care to Medicare and Medicaid patients at Northside Hospital, and even resulting in the death of certain patients that could have been prevented with proper care.

**21.** The Defendants collaborated and engaged in a range of improper and fraudulent activities and techniques in order to increase the amount of the reimbursement that Defendant Northside Hospital received from Medicare and Medicaid, by causing to be filed and filing false claims for reimbursement to the United States Government (the **"Government"**).

**22.** Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed.

**23.** Farnsworth acquired firsthand knowledge of the false claims described below. Each described act or omission was knowingly committed by personnel at Northside Hospital in an attempt to secure federal funds or was knowingly committed by personnel at Northside Hospital in an attempt to retain federal funds already paid to Northside Hospital and to avoid disgorgement of those funds.

**24.** While Farnsworth is able to include the identity of some of the specific acts, omissions, patients and dates related to the false claims in this complaint, Relator is unable to

4

plead all of the details of those claims because the necessary information is in the custody and control of Defendants.

25.   Pursuant to Medicare and Medicaid rules and regulations, a hospital "must be in compliance with applicable Federal laws related to the health and safety of patients" to receive benefits from the program. 42 C.F.R. § 482.11.

26.   The hospital's governing body must ensure the medical staff is accountable to the governing body of the quality of care provided to patients. 42 C.F.R. § 482.12(a).

## A. Unsupervised Interns and Residents Services Billed at Attending Physician Rates.

27.   If a medical resident or intern participates in a service furnished in a teaching setting, a teaching physician must be "present during the key portion of any service or procedure for which payment is sought." 42 C.F.R. § 415.172 (a).

28.   Emergency services must also be supervised by a qualified member of the medical staff. 42 C.F.R. § 482.55.

29.   Defendants routinely billed Medicare and Medicaid for the treatment of certain patients even though a teaching physician (an attending physician) was not physically present when a medical intern or resident performed the medical procedures on the patient.

30.   Defendants encouraged the teaching physicians to fraudulently misrepresent, in the applicable medical records, that they were present during the key portions of any services and procedures so that the services could be billed at the attending physician's rates.

31.   Late in the afternoon of May 28, 2011, J.Q., a 44 year old patient, was admitted to Northside Hospital from the Pinellas County Jail. He was admitted as a patient of Dr. Lopez for

observation due to gastrointestinal bleeding.  Dr. Jayaprakash Kamath was called for a consultation, but never provided the service.

**32.**  After admission to the floor, J.Q. vomited approximately one and a half liters of blood at approximately 1:00 a.m. on May 29, 2011.

**33.**  No physician observed J.Q. regarding the critical bleeding until almost four (4) hours later at 4:45 a.m., when an unsupervised resident physician responded to an emergency call from the nursing staff.

**34.**  After extended resuscitation efforts were performed by the resident, Patient J.Q. died with no teaching physician present.

**35.**  Dr. Kamath observed patient J.Q. for the first time shortly before he was pronounced dead at approximately 7:00 a.m. on May 29, 2011.

**36.**  J.Q.'s death was never reported to AHCA pursuant to Florida Statute § 395.0197(8) (2011).

**37.**  Section 395.0197(8) of the Florida Statutes requires reporting of adverse incidents whether occurring in the licensed facility or arising from health care prior to admission to the facility, by the facility to the Agency within 15 calendar days after its occurrence.

**38.**  Defendants fraudulently billed Medicaid for the medical services as though Dr. Lopez and Dr. Kamath were supervising the procedures performed by the resident.

**39.**  On September 11, 2011, Dr. Joseph Zalocha of Northside Hospital falsified medical documents to reflect that he was present for inpatient services performed by resident Dr. Krystle Bujold on patient R.M.  Dr. Bujold, a resident physician, had inserted a central intravenous line into patient R.M. without supervision.  Teaching physician Dr. Zalocha was at home at the time the service was rendered by resident Dr. Bujold.

**40.**     Defendants fraudulently billed Medicare for the medical services as though Dr. Zalocha was supervising the procedures performed by resident Dr. Bujold.

**41.**     On September 13, 2011, Dr. Piyush Dalal of Northside Hospital falsified medical documents that he was present for inpatient services performed by resident Dr. Holly Vicars on patient G.M.   Resident Dr. Vicars performed an intubation and placement of a central intravenous line into patient G.M. without supervision.   Teaching physician Dr. Dalal was not physically present during the critical or key portion of the service rendered by resident Dr. Vicars.

**42.**     Defendants fraudulently billed Medicare for the medical services as though Dr. Dalal was supervising the procedures performed by resident Dr. Vicars.

**43.**     In early November 2011, an emergency room physician placed a Intra-osseous Catheter line ("IO") in a 27 year old female Patient P., whose full name is unknown, with a history of drug addiction.

**44.**     The policy for an IO is that a resident/intern or teaching physician must remove the IO.

**45.**     Because the IO is very dangerous, it is meant to be temporary, and must be removed within 24 hours of insertion.

**46.**     The physician caring for Patient P wrote an order for the IO to be removed within 24 hours of insertion.

**47.**     The unsupervised resident assigned to Patient P ignored the order and did not remove the IO from Patient P. for over 29 hours after insertion.

**48.**     As a result, the IO became infiltrated within in the bone and intravenous fluids were instilled into the muscle and soft tissues of the leg, instead of safely into the intra-osseous space.

**49.**    As a direct result, Patient P lost a large portion of her leg and was hospitalized for over two months.

**50.**    When Relator Farnsworth contacted ACHA regarding the incident, she was reprimanded and told she should have discussed reporting with Steve Daugherty, Chief Executive Officer, prior to calling ACHA.

**51.**    Defendants fraudulently billed Medicare for all the medical services as though the supervising physician was present during the procedures performed by resident.

**52.**    On November 25, 2011, Dr. Joseph Zalocha of Northside Hospital falsified medical documents that he was present for inpatient services performed by resident Dr. Andrew Fiskey on patient E.H.  Resident Dr. Fiskey inserted a central intravenous line into patient E.H. without supervision.  Teaching physician Dr. Zalocha was not physically present during the critical or key portion of the service rendered by resident Dr. Fiskey.

**53.**    Defendants fraudulently billed Medicare for the medical services as though Dr. Zalocha was supervising the procedures performed by resident Dr. Fiskey.

**54.**    The lack of teaching physician supervision over medical students and residents has caused a severe detrimental effect upon the quality of care received by patients at Northside Hospital and certain avoidable injuries.

**55.**    For example, on April 21, 2010 at 2:30 a.m., the night after a tracheostomy tube was placed in Patient M.W., M.W. developed a tension pneumothroax.  The covering residents, Dr. Hung Pham (a second year medical student) and Dr. Eugenia Samoilova Wagoner (a first year medical student), were unsupervised and failed to timely treat the patient, resulting in the patient's death.  When the unsupervised treatment was rendered, it was too late, and M.W. died as a result.  Patient, M.W.'s death was avoidable had the supervising teaching physician, Dr. Mark Stine, been present to help the residents treat the patient in a timely manner.

**56.**     Northside Hospital subsequently billed Medicare for the unsupervised treatment of patient M.W. even though these services were ineligible for Medicaid reimbursement because of the lack of supervision.

**57.**     The lack of resident supervision is routine procedure at Northside Hospital as evidenced by a log book which tracks the supervision of residents.   Once a resident has performed several supervised procedures according to the log book, the resident is allowed to complete future procedures without the supervision of a teaching physician.

**58.**     Residents are even allowed to respond to emergency codes and independently perform procedures during rapid responses.

**59.**     Teaching physicians who involve residents in the care of his patients must be identified as such on both medical records and the Medicare and Medicaid claims.   Claims must include a certification that the teaching physicians have complied with the guidelines and specifically document they were in fact present for the procedure.

**60.**     Defendants submitted claims to Medicare and Medicaid without the required certification from the teaching physicians in the Defendants' medical records.

## B. Falsified Medical Records Relating to Suspended Physicians

**61.**     In December 2011, Defendants submitted numerous fraudulent documents to Medicare and Medicaid regarding medical treatment that was actually performed by suspended physicians, but falsely billed under another physician's name.

**62.**     In order to get the medical bills paid by Medicare and Medicaid, the identities of the suspended physicians who actually treated the patients were not included in the medical records.     Instead, the Defendants encouraged the staff at Northside Hospital to include a

privileged physician's name on both the order and claim in order to defraud the Government by not revealing the status of the physician who actually rendered the medical services, which would have precluded Northside Hospital's right to reimbursement.

63. The dates of such misrepresentations, the suspended physicians, the participating staff members, and the physician whose names were falsely used on the orders include the following:

(a) On December 23, 2011, a Northside Hospital employee, Jennifer Miller, fraudulently entered an order into the computer for Patient A.A., for "soap sud enema now" ordered by Dr. Hazem Al-Andary, who was suspended. Even though Dr. Fadi Saba did not make the order, Jennifer Miller falsely used his name when she entered the order into the computer.

(b) On December 29, 2011, a Northside Hospital employee, Caretta Allen, falsely entered an order into the computer for Patient J.W. for "DC Stroke protocol" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Caretta Allen falsely used his name when she entered the order into the computer.

(c) On December 30, 2011, a Northside Hospital employee, Michele Routh, falsely entered an order into the computer for Patient J.W. for "1800 Calorie/day diet" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Michele Routh falsely used his name when she entered the order into the computer.

(d) On December 30, 2011, a Northside Hospital employee, Michele Routh, falsely entered an order into the computer for Patient J.W. for "patient may shower" ordered by Dr. Hazem Al-Andary who was suspended. Even though

Dr. Fadi Saba did not make the order, Michele Routh falsely used his name when she entered the order into the computer.

**(e)** On December 26, 2011, a Northside Hospital employee, Chris Cincotta, falsely entered an order into the computer for Patient R.R. for "Coreg 6.2 Q12" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Chris Cincotta falsely used his name when she entered the order into the computer.

**(f)** On December 26, 2011, a Northside Hospital employee, Carol Miller, falsely entered an order into the computer for Patient R.R. for "BMP/BNP in a.m." ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Carol Miller falsely used his name when she entered the order into the computer.

**(g)** On December 23, 2011, a Northside Hospital employee, Ini Umoren, falsely entered an order into the computer for Patient R.R. for "Gemfibrozil 600mg" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Ini Umoren falsely used his name when she entered the order into the computer.

**(h)** On December 23, 2011, a Northside Hospital employee, Lo-An Pham, falsely entered an order into the computer for Patient R.R. for "Lasix 20mg" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Lo-An Pham falsely used his name when she entered the order into the computer.

**(i)** On December 23, 2011, a Northside Hospital employee, Lo-An Pham, falsely entered an order into the computer for Patient R.R. for "Protonix" ordered

11

by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Lo-An Pham falsely used his name when she entered the order into the computer.

(j)    On December 23, 2011, a Northside Hospital employee, Karen Arbidson falsely entered an order into the computer for Patient R.R. for "Stool for OB" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Karen Arbidson falsely used his name when she entered the order into the computer.

(k)    On December 30, 2011, a Northside Hospital employee, Kathleen Sanetrick, falsely entered an order into the computer for Patient R.M. for "Librium 50mg" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Kathleen Sanetrick falsely used his name when she entered the order into the computer.

(l)    On December 30, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient R.M. for "Procardia 60mg" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(m)    On December 30, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient R.R. for "Albuterol" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(n)     On December 30, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient R.M. for "Oxycodone 1tab" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(o)     On December 30, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient R.M. for "Thiamine" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(p)     On December 30, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient R.M. for "Folic Acid" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Nino Kurtsikidze did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(q)     On December 31, 2011, a Northside Hospital employee, Dawn Ritzenthaler, falsely entered an order into the computer for Patient T.P. for "Prednisone" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi Saba did not make the order, Dawn Ritzenthaler falsely used his name when she entered the order into the computer.

(r)     On December 27, 2011, a Northside Hospital employee, Amanda Lim, falsely entered an order into the computer for Patient T.P. for "Solumedrol" ordered by Dr. Hazem Al-Andary who was suspended. Even though Dr. Fadi

Saba did not make the order, Amanda Lim falsely used his name when she entered the order into the computer.

**(s)**    On December 30, 2011, a Northside Hospital employee, Emilia Jiminez, falsely entered an order into the computer for Patient T.P. for "Spiriva inhaler" ordered by Dr. Hazem Al-Andary who was suspended.   Even though Dr. Fadi Saba did not make the order, Emilia Jiminez falsely used his name when she entered the order into the computer.

**64.**    In each of these incidents, the Northside Hospital employee was unable to enter the order of the suspended physician because the hospital computer automatically blocked access when the physician lost his hospital privileges during suspension.   In order to get around the blocked access, the hospital employees were instructed to enter the order under the name of another physician who had hospital privileges.

**65.**    Defendants billed Medicare and Medicaid even though these services were ineligible for Medicaid reimbursement without a valid physician's order.

**C.    Violation of Medicare Billing Guidelines.**

**66.**    Pursuant to federal guidelines governing the Medicare and Medicaid programs, medical record personnel are to be employees of the hospital.

**67.**    The CMS guidelines further require that the hospital employ an adequate number of medical records personnel, employ adequate types of medical record personnel, and employ personnel who possess adequate education, skills, qualifications and experience to ensure that the

14

hospital complies with requirements of this regulation and other Federal and State laws and regulations.

**68.** In early 2010, Defendants separated the Medical Record Department from Northside Hospital. Instead of being employed by Northside Hospital, all medical record personnel were then employed by a wholly owned subsidiary of Defendant HCA named HSS Systems, LLC.

**69.** Krystle Booth (**"Booth"**) was employed by Northside Hospital as Director of Medical Records, through January of 2010. In February 2010, she was employed by HSS Systems, LLC, but, in that capacity, she retained her position as Director of Medical Records for Northside Hospital.

**70.** For reasons unknown to Relator, in May 2011, Defendant Parallon took over the medical records services provided by HSS Systems, LLC.

**71.** As a result, Ms. Booth's employer changed to Defendant Parallon.

**72.** In January of 2012, Ms. Booth asked Gary Searls, Chief Financial Officer at Northside Hospital (**"Searls"**), why the medical record personnel were no longer employees of Northside Hospital. Booth copied Relator Farnsworth on all emails regarding the medical records personnel since Relator Farnsworth was the Vice President of Quality and Risk Management at Northside Hospital, and in her role was responsible for assuring compliance with the Medicare guidelines and preparing the facility for a full CMS survey.

**73.** Searls directed inquiry to Linda Lemon-Steiner, Vice President of Quality for Defendant HCA, and Kelly Wilson, an employee of Defendant Parallon. Kelly Wilson subsequently responded to Searls via email stating that, "We are all employees of HCA, so I am of the opinion we are compliant with this guideline."

**74.** Searls instructed Relator Farnsworth and Booth to avoid discussing Parallon's employment of Northside Hospital's Medical Record Department with the CMS surveyors.

**75.** The CMS guidelines require the hospital to have an established medical record system that is organized to ensure prompt completion of medical records, filing of medical records, and retrieval of medical records.

**76.** Maintaining medical records by employees of the hospital is imperative to the safety of the patients and for accountability purposes.

**77.** Relator Farnsworth is responsible for supervision of the review of medical records when a patient has a hospital-acquired condition.

**78.** On several occasions when a mistake was found in a medical record by Farnsworth, Parallon employees refused to question the physician providing the medical service in order to correct the billing code. Farnsworth had no authority over the Parallon employee to insure compliance with the procedure to question the physician so that the proper steps could be taken to correct the billing code. The Parallon employees' refusal to correct codes caused Medicare and Medicaid to be billed improperly.

**79.** For example, Patient X, whose real name is unknown, was coded as suffering from chronic kidney failure. Upon review of the records, Relator Farnsworth discovered that the clinical findings and laboratory results did not reflect that the patient had kidney failure. Relator Farnsworth requested that a coder at Parallon question the physician so that the proper services could be billed to Medicare and Medicaid. The Parallon employee refused to query the physician or to change the code.

**80.** Parallon's medical records department does not complete medical records promptly which has prolonged necessary action in urgent situations.

**81.** For example, on or about November 14, 2011, a family member contacted Monica Zeiss, Assistant Chief Nursing Officer of Northside Hospital, regarding a sexual battery on an elderly patient who was recently discharged from Northside Hospital. The patient's medical records contain multiple late entries, not only entered after discharge but after the family member complained about severe vaginal bruising that occurred while the patient was treated at Northside Hospital and as a direct result of the sexual battery.

**82.** Relator Farnsworth did not learn about the suspected sexual abuse until several days after the initial complaint call to Monica Zeiss, as she was in Nashville at HCA Corporate with Kathy Dimaggio, Director of Risk Management. Once she became aware of the abuse, Relator Farnsworth immediately instructed Ms. Zeiss to report the abuse pursuant to Florida Statute § 395.0197 (2011). This sexual abuse case was the basis for a "for cause" Agency for Health Care Administration (**"AHCA"**) survey on December 21, 2012.

**83.** During the "for cause" survey, the AHCA surveyor asked Monica Zeiss why she did not immediately report the sexual abuse. Ms. Zeiss completely misled the AHCA surveyor Nila Perone. Ms. Zeiss stated that the patient's family did not notify her about the patient's vaginal bruising during their initial report. However, an email from Ms. Zeiss to the Chief Nursing Officer on the day the patient's family spoke to Ms. Zeiss indicates that the family member was "complaining of vaginal bruising". Farnsworth reviewed the email with Nila Perone, AHCA surveyor. Steve Daughtery, CEO, reprimanded Farnsworth and questioned why she had not prevented the surveyor from seeing the email.

**84.** Another problem with the medical records is that Northside Hospital patients are routinely admitted into the hospital without a required patient status designation as inpatient or observation. Instead, admission status is routinely being determined after the patient is discharged, often beyond the 12 days after admission as required by Medicare.

**85.**     In addition to the completion, filing and retrieval of medical records, all coding and billing of medical services at Northside Hospital and other HCA hospitals are performed by Parallon employees.

**86.**     Hospitals participating in Medicare must meet certain specified requirements. 42 C.F.R. § 482.1(a).  One such requirement is that the hospital *must employ* adequate personnel to ensure prompt completion, filing, and retrieval of records. 42 C.F.R. § 482.24.

**87.**     Northside Hospital does not qualify to participate in the Medicare program because it does not employ any personnel responsible for medical records.

**88.**     Accordingly, all bills for medical services since February 2010 are fraudulent since they were presented by Defendant Parallon, a non-qualifying facility.


**D. <u>Double Billing</u>.**


**89.**     Defendants are double billing Medicare for services that have been paid previously or are paid for by another entity.

**90.**     Defendants conducted medical research on patients without prior approval by the Northside Hospital's Board of Trustees or the Medical Executive Committee, as required by the Board Charter, and other regulatory standards.

**91.**     Since the September 2011 termination of Dr. Charles Nutinsky, Chief Medical Officer and Director of Medical Education, no Research Committee meetings had been held nor was anyone reporting data to the Board regarding research trials.

**92.**     Yet, several research projects were started and being conducted after Dr. Nutinsky's departure.

**93.**     When Ms. Farnsworth discovered the unauthorized medical research, Steven Daughtery, Chief Executive Officer at Northside Hospital, directed Ms. Farnsworth to mislead the Board of Trustees by instructing Farnsworth to "leave out" of her research report to the Board of Trustees any mention that all trials did not have appropriate approvals.

**94.**     Contrary to Defendants instructions, Ms. Farnsworth reported the lack of approval for the medical research to the Board.

**95.**     Not only were the research projects not approved, Defendants billed Medicare and Medicaid for these ineligible medical services even though payment was already received from the research grant funds.

**96.**     Defendants are also double billing when the service has already been paid for by one patient, but used on a different patient, who was also billed for the services.

**97.**     For example, Patient L.L. a retired Hillsborough County Judge, was admitted to Northside Hospital due to heart problems.

**98.**     Dr. Natoli ordered a "nitro" patch but instead medical staff administered a "nicotine" patch, which may increase the likelihood of a heart attack.

**99.**     In addition, L.L. received medication that was prescribed and dispensed for another patient, N.V., who had been discharged two weeks prior.   All the medication that was received for patient N.V. was not administered to N.V. prior to discharge.   Thus, the surplus medication was being administered to patient L.L.

**100.**     Defendants not only billed N.V. for the medication, but also billed L.L. for the same medication.

**101.**     Another example of double billing is when a Medicaid patient M.W., a 47 year old mother, was admitted to Northside Hospital for chest pains on October 2, 2011, under the care of Dr. Johnny Johnson.

**102.** Dr. Stephen Minor, a cardiologist employed by Northside Hospital, reported that the echo cardiogram was normal and the patient was discharged

**103.** Four days later, M.W. was readmitted unconscious to the Intensive Care Unit by Dr. James Zalocha where she subsequently died from a ruptured aortic dissection. Her death was completely avoidable, as confirmed by a peer review, if Northside Hospital had provide adequate services.

**104.** Yet, Defendants were able to bill Medicare for two hospital visits for M.W., and received a critical level fee for the second visit due to the death, even though the death was caused by inadequate services provided by Northside Hospital.

**105.** M.W.'s death was never reported to AHCA pursuant to Florida Statute § 395.0197(8) (2011).

**E.   Additional Fraudulent Conduct to Maximize Profits.**

**106.** Northside Hospital encouraged staff to complete fraudulent reports for patients before and after discharge in order to fraudulently bill Medicare and Medicaid for unnecessary tests and treatment in order to maximize profits.

**107.** Patients were forced to go home prematurely or were being advised by the staff to leave Northside Hospital in order to get better care at another facility when Medicare and Medicaid benefits were exhausted. After discharge, the patient's medical records fraudulently indicated that they left against medical advice so that the hospital was able to still bill Medicare and Medicaid for services provided to the patient.

**108.**   Relator Farnsworth created reports on patients that left against medical advice. According to her reports, Northside's rate of patients leaving against medical advice is approximately 3.5%, well above the national standard of 1.2 % to 2%.

**109.**   In one specific case, the Defendants were unable to discharge the patient because Patient X, whose real name is unknown, was brain dead and on life support. For months, Northside Hospital was unable to locate her next of kin and eventually, Patient X Medicare and Medicaid funding was depleted.

**110.**   Defendants' employee, Audra Earle, Chief Operating Officer, caused a woman to pose as the patient's niece. The "niece" fraudulently executed documentation that would have allowed the hospital to take the patient off all life support. A physician became aware of the situation, tracked down the young woman, and convinced her to come back to the facility and tell the truth that she had in fact been paid to provide false information, and that she was not the niece of this patient. The nurse documented this in the medical record. The nurse was subsequently terminated, but the patient's life was saved.

**111.**   Defendants have increased profits by deliberately understaffing Northside Hospital. Unsafe staff levels have increased injuries among patients which also increases the volume of medical services rendered and the amount of Medicaid and Medicare reimbursement received at Northside Hospital.

**112.**   Relator Farnsworth reported the unsafe staffing levels to Steven Daughtery, Chief Executive Officer of Northside Hospital, on numerous occasions. Despite Relator Farnsworth's numerous complaints, Mr. Daughtery refused to provide adequate staff.

**113.**   For example, in late August of 2011, Patient X, whose real name is unknown, fell while in the stroke unit on a night shift and sustained a subdural hematoma which caused permanent cognitive deficits. The charge nurse on duty, Caretta Allen was present during the

incident. Relator Farnsworth was present during the Root Cause Analysis meeting where it was found that had the stroke unit been adequately staffed, the patient's injury could have been avoided.

**114.** Janet Delasandro, Intensive Care Unit Director, mislead the AHCA surveyors by stating that the nurse ratio in the ICU never goes over two to one. In reality, the nurse ratio is three to one at all times in the ICU. Immediately after learning about the deliberate misrepresentation, Relator Farnsworth contacted an AHCA surveyor to inform her of the misrepresentation regarding nursing ratios at Northside Hospital.

**115.** Defendants also maximize profits by failing to provide adequate medical equipment. Northside Hospital is required by law to have adequate capacity coolers in the morgue. Northside should have at least an eight capacity coolers since it has 288 beds. Northside currently has a four capacity coolers. At the incident described below, Northside only had a two capacity coolers.

**116.** On Friday, August 19, 2011, when Patient X, whose real name is unknown, died, there was no cooler space in the morgue to store her body. Consequently, Patient X's body was left outside the cooler over the weekend. When the mortuary came to pick up the body on Monday, the patient's body was severely decomposed. Patient X's family was unable to have their desired funeral because of the horrific condition of the body.

**117.** While saving money on not providing adequate staff or equipment, Northside Hospital and HCA unethically attempt to increase occupancy rates by employing scare tactics and self-referral.

**118.** Northside Hospital engaged in inappropriate mail solicitation, meaning that the hospital solicited heart patients to get tests done that were unnecessary, specifically, ejection fraction which tests the efficiency of the heart. They sent out letters to heart patients around the

Tampa Bay Area using the scare tactic of "if you don't know your ejection fraction, you should - it could save your life".

119. HCA has an unlawful policy of self-referral whereby physicians at Northside Hospital are required pursuant to a Mandatory Transfer Agreement, to transfer patients only to HCA hospitals even if non HCA facilities are closer and more convenient for the families of these often critically ill patients.

120. When an HCA patient needs to be transferred to another facility for specialized treatment, the employees at the HCA hospital are required to call HCA's transfer department to facilitate the transfer to only another HCA hospital even if a nonaffiliated hospital with the specialized services is much closer. This practice is being done solely to maximize profits of the corporate office of HCA.

121. Although the Mandatory Transfer Agreement has existed for some time, it was formalized in January of 2012 with the creation of a transfer center. HCA prepares daily "leakage reports" in order to track all discharged patients that have been transferred to other nonaffiliated hospitals. Any patient who is transferred to a non-HCA hospital is considered "leakage." These leakage reports are distributed to the employees at Northside Hospital. HCA's overall goal is to maximize profits by preventing "leakage."

122. The Defendants knew that the conduct described above would result in the presentation of fraudulent claims for payment to the government, in contravention of the Medicare and Medicaid regulations, by which they were required to abide.

123. As a result of all of the above fraudulent conduct, Northside's overall medical charges are the second highest in the state.

**F.**     **Retaliation Against Farnsworth.**

**124.**     On August 25, 2011, only two weeks after Relator Farnsworth began her employment, surveyors from AHCA arrived at Northside Hospital to conduct a "for cause survey" in response to numerous serious complaints which had been filed.

**125.**     On October 6, 2011, the Triennial Joint Commission conducted a survey. Based on information obtained from Relator Farnsworth, the surveyors determined that the Chief Nursing Officer, Pam Carroll, was not qualified for that position. With Relator's assistance, the Commission discovered numerous medical records were deficient.

**126.**     On December 21-22, 2011, AHCA conducted an unannounced survey "For Cause" after receiving three complaints regarding patient care. AHCA discovered that medical records had been substantially altered and amended in a suspicious manner. One example is the patient that may have been sexually battered, as described in detail above in paragraphs 81 to 83.

**127.**     As a result of the December survey, AHCA recommended a Full CMS Survey be conducted within sixty (60) days.

**128.**     On February 2, 2012, Relator Farnsworth prepared a Complaint to put Kelley Furbee, Assistant Vice President of Human Resources at HCA in Nashville, on notice of the Northside Hospital's noncompliance with several laws, rules and regulations. Relator Farnsworth was informed by Mr. Furbee that Jennifer Barres, West Florida Division Vice President Human Resources, would be investigating her Complaint. Ms. Barres called to set an appointment with Ms. Farnsworth for February 6, 2012.

**129.**     On February 6, 2012, Relator Farnsworth was abruptly placed on administrative leave and was escorted from Northside Hospital immediately with no access to her office or personal property. She was instructed not to contact any of Northside Hospital's employees.

24

**130.** On February 29, 2012, AHCA conducted a survey on behalf of CMS that lasted three days.

**131.** Even though Relator Farnsworth was on administrative leave, she assisted by telephone with the surveyors to uncover numerous discrepancies in the medical records. AHCA found that rules and laws were violated during their visit at Northside Hospital.

**132.** Relator Farnsworth was formally offered a severance package on February 20, 2012. Farnsworth declined to accept the severance package proposal.

**133.** In a letter dated March 9, 2012, the attorney for Northside Hospital claimed that Relator Farnsworth was placed on administrative leave due to "insubordination."

**134.** The real reason that Relator Farnsworth was placed on administrative leave was because she had direct knowledge of various types of fraudulent conduct occurring at Northside Hospital, and the Defendants did not want her to cooperate in the upcoming CMS survey.

**135.** The Defendants did not know how the surveyors were able to pin-point certain discrepancies in the medical records that Relator Farnsworth had secretly relayed to them, and they suspected and accused the Northside Hospital's Director of Medical Records, Krystle Booth ("**Booth**").

**136.** Although Booth denied providing the information to the surveyors, Defendants placed her on suspension, pending an investigation on who was the informant. Booth was precluded from working for approximately three weeks.

**137.** When the Defendants could not find any evidence that Booth was the informant, she was allowed to return to work. Although she resumed her employment with Parallon, she lost her position at Northside Hospital as the Director of Medical Records. Her office is now located at Parallon's corporate offices where she can be closely monitored by the Defendants.

**138.**   To date, Relator Farnsworth has not been allowed to return to her position as Vice President of Quality and Risk Management at Northside Hospital.

**139.**   Relator Farnsworth is not aware of what action, if any, the Defendants have taken to correct these fraudulent practices.   Thus, it is Relator Farnsworth's intention to bring this action to the attention of the United States Government at this time.

**140.**   Prior to her employment at Northside Hospital, Relator Farnsworth was employed for over ten years at HCA facilities in Salt Lake City, Utah, of which she was Executive Director of Quality Services for two of those years.

**141.**   Immediately prior to her employment with Northside Hospital, she was employed at Lakeland Regional Hospital as the Director of Quality, Patient Safety and Accreditation.

**142.**   In her over twenty (20) years of experience in the health care quality and risk, she has never experienced the incompetent dangerous conditions that she witnessed at Northside Hospital.

<u>**False Claims Act Violations**</u>

**143.**   Defendants encouraged, authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

**144.**   In submitting false Medicaid and Medicare claims to the Government, Defendants falsely certified, expressly and implicitly, compliance with all Medicaid and Medicare rules and regulations.

**145.**   By engaging in the acts set forth above, the Defendants, HCA and Northside Hospital, by and through their agents, officers and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, **(i)** knowingly presented or caused to be presented to the

Government numerous false or fraudulent claims for payment or approval; **(ii)** knowingly made, used or caused to be made or used, false records or statements to get a false or fraudulent claims paid or approved by the Government; and **(iii)** conspired to defraud the Government by getting a false or fraudulent claims allowed or paid.

**146.**    The United States, Northside Hospital patients, and the public have all been damaged as a result of Defendants' violations of the False Claims Act.

**147.**    The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the Defendants' violation of 31 U.S.C. § 3729.

**148.**    In addition, the United States is entitled to a civil penalty of between $5,000 and $10,000 is required by 31 U.S.C. § 3729 for each violation of the False Claims Act by the Defendants.

**149.**    Farnsworth is also entitled to reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(1).

WHEREFORE, the Relator, Brenda Farnsworth, on behalf of herself, the United States and the State of Florida request that this Court grant the following relief:

**(a)**    That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729.

**(b)**    That judgment be entered against the Defendants, HCA Holdings, Inc. and Galencare Inc. d/b/a Northside Hospital in an amount equal to three times the amount of the damages the United States has sustained because of their actions, plus **(i)** a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. § 3729 and **(ii)** the costs of this action, with interest, including the costs of the United States and the State of Florida for their expenses related to this action;

**(c)**    That the Relator be awarded all costs incurred including reasonable attorneys' fees;

**(d)** That in the event the United States intervenes in this action, the Relator be awarded 25%, but in no event less than 15%, of the proceeds of the resulting judgment in or settlement of this action;

**(e)** That in the event that the United States does not intervene in this action, the Relator be awarded 30%, but in no event less than 25%, of the proceeds of the resulting judgment or settlement of this action;

**(f)** That the Relator and the United States be awarded prejudgment interest; and

**(g)** That the United States and the Relator receive all relief both at law and at equity as this Court determines is appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

DATED on April 6, 2012.

Respectfully submitted,

**BRENDA FARNSWORTH**

**J. MEREDITH WESTER, ESQUIRE**
Florida Bar Number 881317
**RICHARD W. CANDELORA, ESQUIRE**
Florida Bar Number 198056
**KRISTA L. PENDINO, ESQUIRE**
Florida Bar No. 88775
**MECHANIK NUCCIO**
**HEARNE & WESTER, P.A.**
18560 N. Dale Mabry Highway
Lutz, Florida 33548
(813) 968-1002 / (813) 968-1502 *(facsimile)*
Attorneys for Relator Brenda Farnsworth